GEORGE L. KENT, Respondent, v. THE QUICKSILVER MINING COMPANY and others, Appellants.

*Corporation — right of, to issue preferred stock.*

Where a joint stock corporation, in pursuance of its charter, establishes its capital at $10,000,000, divided into 100,000 shares of stock of the value of $100 each, and issues certificates therefor in the usual form, it cannot thereafter, by a vote of a majority of the stockholders, provide that the holders of the common stock may convert the same into preferred stock, entitled to certain privileges, upon the payment of a specified sum, although its charter does

not prohibit the creation of such preferred stock, unless all the holders of such common stock consent thereto, or unless the power so to do has been reserved by the corporation itself at or before the time of the issuing of the stock.

The holders of common shares, who consent that the preferred shares issue, are precluded by such consent from denying their validity.

Where a corporation issued a certain amount of preferred stock, the certificates providing that the holders thereof should be entitled to receive interest thereon at the rate of seven per cent per annum, and that any surplus earnings remaining after the payment of the same should be divided among the holders of the preferred and common stock, *held,* that the corporation could not thereafter issue additional preferred stock, entitled to the same privileges, as the rights of the holders of the preferred stock first issued would be thereby injuriously affected.

APPEAL from a judgment entered upon the trial of this action by the court without a jury, perpetually enjoining the defendant, the quicksilver company, from issuing preferred shares of stock, and the other defendants from converting common shares of the company's stock into preferred stock.

*Joshua M. Van Cott*, for the appellants.

*Grosvenor P. Lowrey*, for the respondent.

DANIELS, J.:

The plaintiff, as the owner of common and preferred shares in the capital stock of the Quicksilver Mining Company, instituted this action to restrain the issuing of further shares of preferred stock. The company was formed by a special act of the legislature of this State, enacted in the year 1866. (Laws of 1866, chap. 470.)

The amount of its capital was not fixed by the charter, but, under its authority, was soon afterwards declared by a by-law adopted under its authority to be the sum of $10,000,000, represented by 100,000 shares of $100 each. These shares were designed to be exchanged and substituted for similar shares of another company chartered under the same name by the legislature of the State of Pennsylvania. A large proportion of the shares of the new company were so exchanged, but up to April, 1870, 14,864 shares still remained unexchanged. The company chartered by the legislature of this State, and the principal defendant in this action, found itself embarrassed by debt and the want of funds, early in the year 1870, and being unable to borrow money to relieve its necessities, proposed to its shareholders a plan for securing money by means of

preferred stock. That was to substitute in place of common shares preference shares to all who should advance the sum of five dollars on a share of common stock. This plan received the assent and approbation of the holders of 75,658 shares, leaving an unassenting minority of outstanding shares of 9,478. The advantages proposed to be secured to the owners of preferred stock shares were the payment of seven per cent interest annually from the 1st of May, 1870, out of the earnings of the company upon each share, and an equal participation with the common shares by way of dividends in the residue of such yearly earnings. And for the purpose of affording an opportunity for the exchange of the common into preferred shares, the books of the company were to be opened at its office in New York, and closed by the board of directors whenever, in their opinion, the interests of the company would be promoted by so doing.

The books of the company were accordingly opened on the twenty-fourth of February and closed on the 18th of April, 1870, which was the time for that purpose designated by the directors. During that period 42,913 shares of common stock were surrendered, and the same number of preferred shares taken in their place on the terms proposed by the directors.

The plaintiff afterwards, and between the years 1870 and 1871, purchased 2,500 of these preferred shares, 1,700 of which have been transferred in his name on the books of the corporation, and for which he has received and holds its certificates. He also became the owner of 100 shares of the common stock of the company, and never consented to the further conversion of common stock into preferred shares.

On the 25th of February, 1874, at a meeting of the stockholders of the company, another resolution was adopted by a vote of 44,750 common and 29,035 preferred shares, extending to the holders of the 57,087 shares of common stock the right to convert them into preferred shares for the sum of five dollars, and interest thereon from the 24th of February, 1870, to be paid upon each share. For that purpose the directors were empowered to open the books of the company, and to close them whenever, in their judgment, the interests of the company would be promoted by doing so

At the time of the adoption of the resolution for the conversion

of the residue of the shares, the earnings of the company had been sufficient to enable it to pay interest at the rate of seven per cent on the preferred stock already issued, and to make a dividend upon both classes of stock, but it was not proposed to distribute those earnings until after the holders of the common were secured an opportunity to convert these shares into preferred shares, and to prevent that privilege from being extended to them, this action was instituted, and the plaintiff has predicated his right to maintain it on the preferred as well as the common shares owned by him, without determining upon which description of shares he might most securely stand. The court at Special Term awarded judgment in his favor.

It is entirely clear, from the case, that the plaintiff himself, as the owner of the 100 shares of common stock, has personally done nothing to preclude himself from questioning the right of the company to convert the remaining common into preferred shares; and as it was not shown that any previous owners of any of the 9,478 of those common shares had in any form assented to the issuing of preferred shares, it may be assumed, for the present purposes of this case, that no such assent has ever been secured from either of them. If the fact were otherwise, it was for the party asserting it to show it by proof, and no evidence of that description was given during the trial; for that reason, the point has been presented, and should now be considered, whether, without the assent or authority of an owner of the common stock, other portions of it may be lawfully converted into preferred shares, entitled to an appropriation of a portion of the net earnings of the company, before the owners of the residue can be allowed to participate in any distribution of them? The scheme devised was not a loan of money, which the company, by one of its original by-laws, was empowered to make, either with or without security, for no agreement, either expressly or by implication, was entered into for the repayment of the money payable on the conversion of the stock. What was agreed upon was a payment of the stipulated amount as the price or consideration of the privilege afforded of exchanging the common into preferred stock; and for that, the owner of the common stock making the stipulated payment of five dollars for each share, became entitled to perpetual interest upon the amount of his share at the rate of seven per cent.

By the arrangement which was made, the net earnings of the company were to be diverted annually, to that extent, from the owners of the common stock, and without any right to redeem the preferred shares.

The charter, in terms, conferred no such power upon the company which it created, but it was authorized to make such by-laws as should be deemed proper to carry out the objects of the corporation, and to alter, amend or repeal them at pleasure, provided that they should not be contrary to the Constitution of the State or the provisions of the charter. It was also given the power to issue certificates of stock, representing the value of its property, in such form and subject to such regulations as it might from time to time, by its by-laws, prescribe. (Laws of 1866, 1021, chap. 470, § 2.) The company, under this general authority, probably had the corporate power in the first instance to have provided by its by-laws for the issuing of a portion of its certificates as preferred shares, but it did not do that.

It merely provided in terms, that certificates of stock amounting to $10,000,000, should represent the value of the property of the corporation, and that the capital stock should be divided into 100,000 shares of $100 each. No discrimination in the nature or form of the certificates was in any way provided for, but the implication clearly arose that they were intended to be identical in those respects, and so they were issued and delivered to the persons receiving them. They contained no intimation that they were liable to any future action of the corporation, by which the advantages expected to be derived from them would probably be diminished, and persons investing their money or property in them were in no way admonished that they were subject to such a contingency. But the import, as well as the language of the certificate, justified an entirely different conclusion. It was issued in such a form as to state that the owner was entitled to $100 in the capital stock of the Quicksilver Mining Company, and by a clear implication that entitled him to a proportionate part of the net earnings of the company. In form the certificates issued by this company were in no respect peculiar. They were identical in their effect and terms with those usually issued by incorporated companies, and they have been so often before the courts for consideration, that the rights of

their holders have become reasonably well settled. This is what has been denominated a joint-stock corporation. A corporation of that description has invariably been empowered "to raise a certain amount of capital by the mutual subscriptions of the members, and this capital is divided into shares, which are made to vest in the subscribers according to their respective contributions, and they entitle the holders of them to a corresponding proportionate part of the profits of the undertaking." (Angell and Ames on Corps. [4th ed.], 562, § 556.)

This principle impresses the shareholder's certificate with the common elements of an agreement, which cannot be changed or modified, when no such power over it has been reserved, by the action of either one of the parties. And it has been so construed in the effect given to it by a decided current of judicial authority.

In the case of *Bradley* v. *Holdsworth* (3 M. & W., 422), it was said by PARKE, B., that "shares consist of nothing more than a right to have a share of the net produce of all the property of the company." The same thing was held of the right of a shareholder in a turnpike company in *Tippets* v. *Walker* (4 Mass., 595), where PARSONS, C. J., declared that " when the road is made, the corporation is entitled to demand and receive a toll of travelers for the use of it, in trust for the members of the corporation in proportion to their respective shares." In the case of *The Union Bank of Tennessee* v. *State Bank* (9 Yerger, 490) it was stated that "the shareholder had the immediate right to receive his share of the dividends as they are declared, and the remote to his share of the effects on hand at the dissolution of the institution." (Id., 50.) And his share entitles him "to his proportion of the profits or dividends, which may be declared from time to time." (*Brightwell* v. *Mallory*, 10 id., 196, 198.) And to the same effect are *March* v. *Eastern Railroad Company* (43 New Hamp., 516, 520), *Mechanics' Bank* v. *New York and New Haven Railroad Company* (3 Kernan, 599, 627), *Wildman* v. *Wildman* (9 Vesey, 174, 177), *Bank of Waltham* v. *Waltham* (10 Met., 334), *Hutchins* v. *State Bank* (12 id., 421), and *Jones* v. *Terre Haute, etc., Railroad Company* (57 N. Y., 196), where it was held that the directors of a corporation have no power to discriminate between its stockholders, where no such power is conferred by its charter. It has also been stated that

"*prima facie* all the shareholders in a company, are entitled to share profits *pari passu* in proportion to the number of shares they respectively hold, and a resolution by a majority that dividends shall be paid to some of the shareholders in preference to or to the exclusion of the others, is clearly illegal unless it is warranted by something more than the will of those who make it." (Id.; Lindley on Part. [2d ed.], 780; *Adley* v. *Whitstable Company*, 17 Vesey, 316; *Scarboro Hotel Company*, 2 D. & S., 514.)

It has been supposed that a different principle was held to be the law in the case of *Hazelhurst* v. *Savannah Railroad Company* (43 Georgia, 53), and an intimation to that effect was very plainly expressed in the opinion of the court, but its effect as authority was entirely counteracted by the preceding remark that the learned judge who delivered the opinion deemed it proper to make, that the court did not feel called upon to decide this question. The case of *Evansville, etc., Railway* v. *Evansville* (15 Ind., 395) simply included the determination that a railroad company, under the peculiar circumstances there shown, could agree to allow interest on its stock taken for bonds by a city, until the railroad should be made complete and ready for operation. In *Bates* v. *Androscoggin Railway* (49 Maine, 491) the proposition to issue preferred stock is stated to have been first presented to, ratified and adopted by, the stockholders of the company at a meeting held on the 21st of August, 1849. (Id., 502.) And in *Henry* v. *Great Northern Railway Company* (1 De Gex & Jones, 606); *London India Rubber Company* (Law Reports, 5 Equity, 518); *Matter of Bangor* (id., 20 Equity, 59) the authority to issue preference shares was secured by act of Parliament, and in *Prouty* v. *Michigan Southern, etc., Railroad Company* (8 N. Y. Sup. Ct., 655), by the statutes of the States permitting the consolidation. Without the actual authority of law, or the consent of the holders of the common shares, the power to issue preferred stock of the description of that presented in this case, does not seem to have been successfully maintained in even a single instance. And as the shares themselves are issued in a form clearly importing a right in the holder to demand and receive a corresponding portion of the net earnings of the company, it cannot consistently be held that he can be deprived, without his own consent, of that right by the combined act of the directors and other shareholders in the

corporation. If that could be done, corporations would be enabled under the sanction of the law, to perpetrate the most gross frauds; for they could receive the subscribers' money, ostensibly and expressly for one thing, and afterwards deprive him of its substantial benefit, by converting it into another entirely different, and of inconsiderable value.

Persons do not subscribe for, nor deal in the stock of corporations upon any such understanding. They proceed upon the expectation, justified by law, that the shares they buy shall not be destroyed by giving others a preference over them, without first obtaining their consent where no power of that nature has been created by statute, or reserved to be exercised afterwards by the corporation itself. Property of this description is protected from spoliation by the same safeguards as have been devised for the preservation of the interest of the owner in that of a more tangible character. He cannot be deprived of it contrary to the essence of the contract creating it, or without his expressed or implied consent.

The shareholders who consented that the preferred shares might be issued, sustain a different relation to such shares, and as the charter itself did not prohibit their creation, but the company was only restrained from doing so by the obligations it had assumed by the certificates of stock it had issued, they should be precluded by their own conduct from denying their binding validity. For under the terms of its charter the company appears to have had the power to have provided by its by-laws for the issuing of preferred shares. In that respect it differed from the authority possessed by the defendant in the ably contested case of *Richie* v. *The Ashbury Company* (Law Term Rep., 7 Eng. and Irish Appeals, 653), where the power exercised was expressly prohibited. In the present case the company had simply deprived itself of the right by the form in which its shares had been originally issued. It was a restraint voluntarily assumed in favor of the owners of its stock, which they could yield and surrender again to the company. And those who by their votes or otherwise authorized or sanctioned the acts of the company in the creation of the preferred shares must have intended to, and did, make that surrender. That was the understanding on which the case of *Bates* v. *Androscoggin, etc., Railroad Company* (*supra*) was decided, and other authorities have proceeded upon the same principle

(*London Building Society,* 21 Law Times [N. S.], 8.) Those parties concurred with the officers in procuring the advance made upon the faith and consideration of the preference shares, and upon plain principles of equity should not, under the circumstances, after that be heard to dispute their validity. But as the plaintiff was not one of those persons, and was not shown to have received but a small portion of his common stock from or under either of them, he cannot, as to the residue, justly be estopped in this manner. For neither he nor they, in any form, induced the persons who exchanged their shares to part with their money, on the expectation that the interest proposed should afterwards be paid to them for doing that.

It has also been urged in the plaintiffs' behalf, that by closing the books, the directors terminated the authority given by the assenting share-owners to issue preferred stock. And such seems to have been the understanding of the parties at the time when the preferred shares were issued, for the certificates contained the statement that "this preferred stock is entitled to interest on the 1st day of May, 1871, and annually thereafter to be paid out of the net earnings of the company for each year, at the rate of seven per cent per annum, provided so much in the year preceding shall have been earned. Should there remain a surplus of earnings after the payment of the said interest upon the preferred stock, then this surplus shall be divided among the holders of the preferred and common stock." The agreement has been plainly stated here, that the existing preferred and common stock shall alone share in the surplus after paying the interest on the preferred shares issued under the resolution of 1870. And that could not be done if the residue of the common can itself still be changed into preferred shares; for a portion of the earnings in that event will be applied to pay the interest on the newly preferred shares, which otherwise would be applied by way of dividends on those which have already acquired this preference. And that would be a violation of the agreement stated in the preference certificates.

If they were lawfully issued, and they certainly were, so far as they had the assent or approval of the owners of the common shares, it consequently follows that the earnings agreed to be appropriated to them by way of dividends cannot, without the consent of the owners of them, be withdrawn from them

and applied by way of interest on other shares afterwards in form promoted to a similar preference. (*McLaughlin* v. *Detroit R. R. Co.*, 8 Mich., 100.) The judgment recovered in the case restrained the company from creating other preferred shares, and from paying any of its earnings on any newly issued preferred shares, while the plaintiff continued to be the owner of common and preferred shares of its stock. No direction was given as to how the fund held as its net earnings should be distributed, and no such direction is required for the purpose of fully disposing of the appeal taken in this case. As far as the judgment extended, it was clearly correct, and it should, therefore, be affirmed, with costs.

DAVIS, P. J., and BRADY, J., concurred.

Judgment affirmed, with costs.